UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PAUL BORITZER AND PAMELA WOLF, as Attorney-
in-Fact for PAUL BORITZER, AND PAMELA WOLF
Individually,

                          *Plaintiffs,*

         -against-

                                  Index No.:  10-CV-6264(JPO)

ALBERT L. CALLOWAY, JR., LESLY BERNARD,
AND BERNARD- CALLOWAY 2008, L.L.C.,

                          *Defendants*.

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ALBERT L. CALLOWAY, JR.'s MOTION TO DISMISS PLAINTIFFS' (CORRECTED) FIRST AMENDED COMPLAINT

**THE BAEZ LAW FIRM PLLC.**
JOSE ANIBAL BAEZ, ESQ.
261 MADISON AVE – 26TH FLOOR
NEW YORK, NEW YORK 10016
212/213-9343
ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ……………………………………………………………...1

FACTUAL BACKGROUND ……………………………………………………………..........2

    THE ENTERPRISE ……………………………………………………………...7

    PATTERN OF RACKETEERING ACTIVITIES …………………………………...8

    EFFECT ON INTERSTATE COMMERCE ……………………………...……11

ARGUMENT ………………………………………………………………...........11

    STANDARD OF REVIEW……………………………………………………11

PLAINTIFFS HAVE PLEADED A VALID RICO CLAIM UNDER 1962(c)…………...….13

    I. PLAINTIFFS HAVE PLED THEIR RICO CLAIM WITH SUFFICIENT PARTICULARITY…13

    II. PLAINTIFFS SUFFICIENTLY PLED A CONTINUING RICO PATTERN……….…….…18

        A. Closed-Ended Continuity………………………………….……….…19

        B. Open-Ended Continuity………………………………………………21

        C. The Cases Relied Upon By Calloway are Inapplicable……………………23

    III. PLAINTIFFS HAVE STANDING TO BRING A CLAIM UNDER RICO…………………24

    IV. PLAINTIFFS DO NOT ALLEGE A RICO CONSPIRACY……………………………… 26

    V. PLAINTIFFS RICO CLAIM IS NOT PREDICATED ON A BREACH OF CONTRACT……..27

    VI. LEAVE TO AMEND IS LIBERALLY GRANTED AND SHOULD NOT BE DENIED ………28

CONCLUSION …………………………………………………………………......30

## TABLE OF AUTHORITIES

**Cases**

Ahmed v. Rosenblatt, 188 F.3d 886 (1st Cir. 1997)………………………………………………...18

Allstate Ins. Co. v. Etienne, 2010 WL 4338333 (E.D.N.Y. 2010)…………………………………16

ATSI Comm'ns Inc. v. Shaar Fund, Ltd., 493 F. 3d 87, 98 (2nd Cir. 2007)……………………..…11

Automated Salvage Transp. Inc. v. Wheelabrator Envtl. Sys., Inc.,
155, F. 3d 59, 67(2d Cir. 1998). ………………………………………………………………....11

Azrielli v. Cohen Law Offices, 21 F.3d 512 (2d Cir. 1994). ………………………………………22

Berk v. Tradewell, Inc., 2003 WL 21664679 (S.D.N.Y. July 16, 2003)………………………….…14

Beth Israel Med. Ctr. v. Smith, 576 F. Supp 1061, 1070-71 (SDNY 1983)…………………………14

Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,
36 F.Supp.2d 560,  585 (E.D.N.Y. 1999)………………………………………………………………26

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001). ……………………………13

Chance v. Armstrong, 143 F.3d 698, 701 (2nd Cir. 1998)…………………………………………..…12

Cofacredit S.A. v. Windsor Plumbing Supply Co. Inc.,
187 F. 3d 229, 242 (2d Cir. 1999)…………………………………………………………………18

Continental Realty Corp. v. J.C. Penney Co., Inc., 729 F.Supp 1452, 1455 (1990)………………..23

Corn-Tech Assocs. v. Computer Assocs. Int'l, 753 F. Supp. 1078, 1091 (E.D.N.Y. 1990)………...20

D'Orange v. Feely, 887 F. Supp. 152, 159 (S.D.N.Y. 1995)…………………………………………26

DeFalco v. Bernas, 244 F.3d 286, 306 (2d. Cir 2001)…………………………………………...13, 16, 19

DiVittorio v. Equidvne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)………………12

Dooner  v. NMI Ltd., 725 F. Supp. 153 (S.D.N.Y. 1989)……………………………………………20

Drexel Burnham Lambert, Inc. v. Saxony Heights Realty, 777 F.Supp 228 (1991)………………..15

Dymm v. Cahill, 730 F. Supp 1245, 1261 (S.D.N.Y 1990)………………………………………...19

FilmTec Corp. v. Hydranautics  67 F3d 931, 935–936 (Fed. Cir. 1995)…………………………...29

First Nationwide Bank v. Gelt Funding, 820 F.Supp 89, 97 (S.D.N.Y. 1993)……………………26

Foman v. Davis 371 US 178, 182 (1962)………………………………………………………….29

GICC Capital Corp. v. Technology Finance Group, Inc.,
67 F.3d 463, 467 (2d. Cir 1995). ………………………………………………………………….21

Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.,
2003 WL 22218643 (S.D.N.Y. 2003)……………………………………………………………..17

Greater Blouse, Skirt & Undergarment Ass'n v. Morris,
1993 WL 410167 (S.D.N.Y. 1993)…………………………………………………………………20

Grier v. Brown 230 F.Supp.2d 1108, 1111 (ND CA 2002)……………………………………...29

H.J. Inc., v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)………………….....19, 21, 23

Hansel N Gretel Brand v. Savitsky,1997 WL 543088 (S.D.N.Y. 1997)……………………………19

Hecht v. Commercial Clearing House. 897 F2d 21, 26 n. 4 (2d Cir. 1990); ……………...…12, 26

Holmes v. Secs. Investor Protection Corp., 503 U.S. 258 (1992)…………………………………..25

Hottinger v. Amcoal Energy Corp., 1994 WL 652499 (S.D.N.Y. 1994)…………………………...16

In re Sumitomo Copper Litigation, 995 F. Supp 451, 456 (S.D.N.Y. 1998)………………......12, 16

International Motor Sports Group, Inc. v. Gordon, 1999 WL 619633 (S.D.N.Y. 1999)…………...17

Jacobson  v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989)…………………………………………….19

Jered Contracting Corp.v.  New York City Transit Auth. 22 N.Y.2d 187, 194 (1968)…………......20

Lanzi v. Brooks, 43 N.Y.2d 778, 780 (1977)………………………………………………………..21

Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d. Cir 2003)…………………………..…..24, 25

Liberty Mutual Ins. Co. v. Blessinger, 2007 WL 951905, at 10 (E.D.N.Y. Mar. 27, 2007)………..12

Martinez v. Newport Beach City 125 F3d 777, 785 (9th Cir. 1997)……………………………29

Moore v. Paine Webber., 189 F.3d 165, 170  (2d Cir. 1999). ………………………………….24

Nundy v. Prudential-Bache Securities, Inc., 762 F.Supp. 40, 44 (W.D.N.Y. 1991)……………...23

Passini v. Falke-Gruppe 745 F. Supp 991, 993 (1990) ………………………………………….23

Polycast Technology Corp. v. Uniroyal, Inc., 728 F. Supp. 926, 948 (S.D.N.Y. 1989)…………19

Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 16 (2d Cir. 1989)…………19

Reingold v. Deloitte Haskins & Sells, 599 F.Supp. 1241, 1266 (S.D.N.Y.1984)…………………17

Richter v. Sudman, 634 F.Supp 234, 239 (S.D.N.Y. 1986)…………………………………………23

Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990)………………………………………………12

Schaller Tel. Co. v. Golden Sky Systems, Inc., 298 F.3d 736, 745 (8th Cir. 2002)……………....12

Sedima v. Irmex Co., 473 U.S. 479, 497-500 (1985) ………………………………………....13, 24

Sheldon Evans, et al v. 95 Avenue Associates, Inc., et al., Index No. 603197/09………………....1

Slayton v. American Express Co. 460 F3d 215, 228 (2nd Cir. 2006)………………………………29

United States v. Autuori, 212 F.3d 105, 115 (2d Cir 2000)…………………………………………14

Uviles v. RYS Int'l Corp., 443 F. Supp. 2d 233 (D.P.R. 2006)……………………………………18

Wynder v. McMahon, 360 F.3d 73, 78 (2d Cir. 2004)………………………………………………11

Zito v. Leasecomm Corp., 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004)…………………………14

**Statutes**

18 U.S.C. 1962(d)………………………………………………………………………………26

18 U.S.C. 1343……………………………………………………………………………………14

Fed.R.Civ.P 15(a). ……………………………………………………………………………29

Pub. L. 91-452, § 904(a), 84 Stat. 922, 947 (1970)………………………………………..,,…………13

**Publications**

"The Fundamentals of RICO", Jed S. Rakoff and Howard W. Goldstein, eds.,
RICO: Civil and Criminal Law and Strategy §1.01 (Law Journal Seminars 2005)………………..13

Rutter Group Practice Guide: Federal Civil Procedure Before Trial, Pleadings………………..28, 29

Plaintiffs Paul Boritzer ("Boritzer"), and Pamela Wolf ("Wolf")(collectively "Plaintiffs")
respectfully submit this memorandum of law in opposition to defendant Albert L. Calloway Jr.'s
("Calloway" or "Defendant") motion to dismiss the (Corrected) First Amended Complaint (the
"Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6), and in support of their motion for leave to
amend the Complaint.

## SUMMARY OF ARGUMENT

In summarizing the facts alleged in the Complaint, Calloway's motion misstates them as
well as the applicable law.  The motion is based on self-serving conclusory assertions and relies
on cases that have no application to the facts of this case.  Defendant's unsupported assertions
that Plaintiffs' action is merely a breach of contract claim involving "a single transaction gone
sour" are wholly belied by the facts.

This civil RICO case arises out of a fraudulent scheme, indeed, a pattern of racketeering
activity, designed and developed by Calloway and defendant Lesly Bernard ("Bernard") to
defraud investors, including Boritzer, out of hundreds of thousands of dollars.  Calloway's
arguments notwithstanding, Plaintiffs' claims are not, in any way, related to an action pending
against Calloway and Bernard, in the Supreme Court of the State of New York.   While fraud is
among the numerous claims asserted against Calloway and Bernard in that case, Plaintiffs have
no connection or privity to any of the parties or the claims therein.[1]

Plaintiffs' Complaint amply pleads the facts necessary to state a cause of action under
RICO statute 18 U.S.C. 1962(c) against Calloway and Bernard.  Indeed, the Complaint pleads

---

[1] *See Sheldon Evans, et al v. 95 Avenue Associates, Inc., et al.*, Index No. 603197/09.

1

RICO with the required particularity, sufficiently alleges the requisite continuing pattern of racketeering activity, and adequately demonstrates a civil RICO conspiracy.  Plaintiff Pamela Wolf has standing to assert an action against Calloway.  Further, Plaintiffs have not asserted a RICO conspiracy claim under 18 U.S.C 1962(d) as Calloway has suggested.

Should the Court determine that more clarity is needed to sufficiently apprise Calloway of the claims against him, Plaintiffs hereby request leave, which under the Rules of this Court and those of the Second Circuit Court of Appeals, should be liberally granted, to amend the Complaint.

There has not been discovery on the issues raised in Calloway's motion.

### FACTUAL BACKGROUND

Boritzer first met Calloway in the summer of 2007, when mutual acquaintances introduced them to each other.  Prior to their introduction, Boritzer was familiar with Calloway only through television because Calloway is one of the hosts of the popular celebrity television show EXTRA.  (Complaint ¶¶ 32 & 33)

In the Spring of 2008, Calloway approached Boritzer with a plan, which Boritzer later learned was nothing more than a fraudulent scheme, that Calloway, and his business partner Bernard, allegedly had to purchase or open several restaurants in New York City, including one which was to be located at 95 Avenue A in Manhattan.  (Complaint ¶ 34)

In April of 2008, Calloway insisted that Boritzer meet with him and Bernard to discuss Boritzer making an investment in Calloway and Bernard's scheme to purchase or open restaurants in the City.  During the meeting, Calloway and Bernard used Calloway's celebrity

status to create the illusion of a legitimate business investment opportunity that a celebrity such as Calloway would create.  (Complaint ¶¶ 35 & 36)

Defendant Bernard for his part, represented to Boritzer at the meeting that he had been in the restaurant business for many years.  To lure Boritzer into investing monies in their plan/scheme, Calloway and Bernard pointed to their purported success with Tilman's Bar and Lounge ("Tilman's"), here in Manhattan.  Defendant Bernard stated that the plan/scheme he and Calloway had put together was a guaranteed success.  Calloway echoed Bernard's assertions and stated that he knew Bernard for many years, that Bernard was a successful restaurateur. (Complaint ¶ 37)

Maintaining Tilman's and using it to lure investors for their scheme was consistent with Calloway and Bernard's regular way of conducting their on-going business.  Indeed, Calloway and Bernard used Tilman's as a front to lure investors.  In fact, Defendants have maintained Tilman's for furthering their common purpose of luring investors into their illegal scheme. (Complaint ¶ 38)

For example, at another meeting held at Tilman's in or about April 2008, Bernard told Boritzer that he was in the process opening several restaurants around the City, and that potential investors were begging him to let them invest in those restaurants.  Not to be outdone, Calloway also made those assertions to Boritzer at the same meeting, including that investors were begging him to let them invest in their plan/scheme.  (Complaint ¶¶ 39 & 40)

Calloway and Bernard have, on information and belief, operated their continuing long-term association and illegal scheme designed to lure investors for a period of least a five-year. Once they fraudulently procured investors' funds, Calloway and Bernard either never opened the

3

restaurants, or if they opened the restaurants, immediately shut them down, keeping the investors' monies.  This was the pattern followed over the last five years by Calloway and Bernard with establishments such as Mr. Jones Restaurant; La Otra and Nightcap; Permanent Brunch; Steak Shoppe; Village Tart, and others all located near the Village here in New York City.  (Complaint ¶¶ 41 & 42)  In furtherance of their scheme, Calloway and Bernard, in an effort to induce Boritzer to invest with them, provided Boritzer with the plans for a number of these aforementioned restaurants.  The short lifespan of these restaurants, funded by other investors, suggests that the scheme Calloway and Bernard, operated was that of a common pattern, extending far beyond this dispute with Plaintiffs.  (Complaint ¶¶ 43 & 44)

To lure Boritzer into their scheme, Bernard and Calloway, told Boritzer that this was a great opportunity for someone like him to get into the restaurant business and demanded that Boritzer make an initial investment of $300,000.  They claimed that with their know-how of the restaurant business in New York, Plaintiff's investment would easily double within 18 months. They also told Boritzer that they had created a limited liability corporation, Bernard-Calloway 2008, which they solely controlled, for the express purpose of funding the purchase of restaurants in New York City.  They further stated that any funds invested by Plaintiff or anyone else would have to be wired to a bank account they had opened for Bernard-Calloway 2008. (Complaint ¶¶ 45 & 46)

In May 2008, Bernard and Calloway demanded that Boritzer immediately invest the $300,000 allegedly because they were ready to move forward with their plan to purchase the restaurants and they did not want Boritzer to miss out on a "great opportunity".  Calloway and Bernard then instructed Boritzer to wire-transfer the $300,000 directly into an account they had

opened at Commerce Bank for Bernard-Calloway 2008, and provided him with instructions to effectuate the transfer. (Complaint ¶¶ 47 & 48)

Concerned about the immediacy of the demands by Bernard and Calloway, Boritzer requested that they provide him with a written plan setting forth the particulars of their venture and of their plans to purchase the restaurants in New York City.  Calloway and Bernard's response was that their lawyer in Washington D.C. was in the process of preparing all documentation.   Simultaneously they insisted that if Boritzer wanted to get in on their plan, he had to immediately invest the $300,000 and that they would provide him with the plans at a later date, while strongly discouraging Boritzer from seeking advice from his lawyer.  To date, the requested written plans have not been provided to Boritzer. (Complaint ¶¶ 49 – 51)

On or about May 22, 2008, relying on the representations of Calloway and Bernard, Boritzer borrowed $300,000 from his partner of many years, Pamela Wolf, and had her wire the $300,000 from her account with UBS Bank, directly into the Bernard-Calloway 2008 account at Commerce Bank as he had been instructed by Bernard and Calloway. (Complaint ¶ 52)

On or about June 3, 2008, <u>two weeks</u> after Boritzer wired transferred the $300,000 to Calloway and Bernard, rather than providing the written plan they had claimed their lawyer was preparing, Calloway and Bernard, executed, in their capacity as principals of Bernard-Calloway, 2008, a document titled "Secured Purchase Money Promissory Note" (herein "Note"), in the amount of $600,000 payable to Boritzer.  Calloway and Bernard insisted that plaintiff Boritzer had to sign the document if he ever expected to get back the $300,000 he had wire-transferred to them a couple of weeks earlier.  According to Calloway and Bernard, their attorney prepared the $600,000 Note.   Fearing that he would lose his $300,000 investment, Boritzer signed the Note.

Calloway and Bernard also signed the Note.  (Complaint ¶¶ 53 & 54)

Immediately thereafter, Calloway and Bernard began demanding that Boritzer invest more money with them.  According to Calloway and Bernard, they needed the additional funds to complete some purchases and to take advantage of new opportunities. (Complaint ¶¶ 55 & 56)

Boritzer initially resisted their demands for additional money, however, Calloway and Bernard were persistent and told him that he risked losing his original $300,000 investment unless he invested another $300,000.  For the rest of the summer of 2008, Calloway and Bernard, constantly harassed Boritzer to invest an additional $300,000, claiming it was needed to take advantage of new opportunities. (Complaint ¶¶ 57 & 58)

Desperate and concerned about losing his original $300,000 investment, Boritzer tried to obtain the $300,000 but could only obtain another $100,000, that he borrowed from a friend, Jacob Goldsmith, in September 2008.  In order to ensure that Jacob Goldsmith would lend Boritzer the $100,000 defendant Calloway demanded that that Boritzer bring Mr. Goldsmith to Tilman's to meet with Calloway and Bernard. (Complaint ¶¶ 59 & 60)

Boritzer and Goldsmith met with Calloway and Bernard at Tilman's in September 2008. At that meeting Calloway and Bernard proceeded to present Mr. Goldsmith with their alleged plans/scheme to purchase or open several restaurants with the funds obtained from investors such as Boritzer. (Complaint ¶ 61)

Calloway and Bernard again instructed Boritzer to wire the $100,000 into the Bernard-Calloway 2008 account at Commerce Bank.   On September 16, 2008, again relying on the representations of Calloway and Bernard that the funds were going to be used for new

opportunities and would prevent the loss of the original $300,000, Boritzer wired $65,000 to Calloway and Bernard from his joint account with long time partner Plaintiff Pamela Wolf at HSBC.  ((Complaint ¶¶ 62 & 63)

On October 1, 2008, Boritzer wired transferred the additional $35,000 to Calloway and Bernard.  Those funds were also transferred from Boritzer's joint account with Plaintiff Pamela Wolf at HSBC.  Calloway and Bernard provided no Note or any other documents to Boritzer for either the $65,000 or the $35,000 transfer. (Complaint ¶ 64)

Boritzer later learned that Calloway and Bernard did not purchase or open any restaurants with the $400,000 they fraudulently obtained from him. (Complaint ¶ 65)

Over the next two and a half years, Boritzer repeatedly requested without success that Calloway and Bernard return the $400,000 they scammed from him, without success. (Complaint ¶ 66)

Over the same time period defendant Calloway continued to harass Boritzer for additional funds to coerce him into further investing in their fraudulent scheme.  Similarly, Bernard also pursued additional funds from Boritzer and continued to use Tilman's to further their fraudulent scheme. (Complaint ¶¶ 67 &68)

### THE ENTERPRISE

Calloway and Bernard, were distinct "persons" within the meaning of the RICO Act, pursuant to 18 U.S.C. §§1961 (3) and 1962 (c). Bernard-Calloway 2008 existed as an LLC formed on April 18, 2008 whose purpose is to own and operate restaurants and related businesses. (Complaint ¶¶ 10 & 11)  Defendants Calloway, Bernard, and Bernard-Calloway 2008

formed an association-in-fact used for the purpose of defrauding plaintiffs.  The association-in-fact is an "enterprise" within the meaning of the RICO Act, 18 U.S.C. § 1961(4) and 1962 (c). (Complaint ¶ 12)  The Defendants engaged in and its activities affected interstate and foreign commerce in the United States within the meaning of RICO, 18 U.S.C. §1962 (c). (Complaint ¶ 13) Calloway, Bernard, and Bernard-Calloway 2008, are associated in fact, directly or indirectly, with the RICO enterprise. (Complaint ¶ 14)

## PATTERN OF RACKETEERING ACTIVITIES

Defendants Calloway, Bernard, and Bernard-Calloway 2008 conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "continuing pattern of racketeering activity" within the meaning of the RICO Act, 18 U.S.C. 1961 (5), and in violation of the RICO Act, 18 U.S.C. 1962 (c); and prior to that by Defendant Calloway and Defendant Bernard's business association. (Complaint ¶ 15)

At relevant times prior to 2008 and to date, defendants, Calloway and Bernard, in their individual capacity and as principals of Bernard-Calloway 2008, operated a complex illegal scheme to defraud investors and engaged in racketeering activities through which Defendants succeeded in obtaining funds from Plaintiffs and other investors, with the intent to defraud Plaintiffs, other investors and, other victims, to acquire funds for the benefit of Defendants.  In carrying out their scheme to defraud investors including plaintiffs, Defendants engaged in conduct that affected interstate and foreign commerce in the United States within the meaning of the RICO ACT, 18 U.S.C. §1962 (c). (Complaint ¶¶ 16  & 17)

Defendants Calloway and Bernard, in their individual capacity and as principals of Bernard-Calloway 2008, operated as part of a long term association for a criminal purpose with the practice of defrauding investors by making false representations that Defendants would open

8

certain restaurants that Defendants never intended to open, or that Defendants intended only to open for a short period to obtain investors' funds and then close down immediately, with the sole intent of defrauding the investors out of their invested monies. This pattern of fraudulent behavior is Defendants' regular way of conducting their on-going business and has been their pattern over at least a five year period. (Complaint ¶¶ 18 & 19)

Based on the nature of the illegal scheme, some of the details of the Defendants' wrongdoing are exclusively within the possession of Defendants, preventing Plaintiffs from pleading certain acts with greater particularity. The complex scheme to defraud and engage in racketeering activities that was carried out by defendants Calloway and Bernard, in their individual capacity and as principals of Bernard-Calloway 2008, which succeeded in taking illegally a total of $400,000 from Boritzer, consisted of an intricate pattern of misrepresentations, fraudulent statements, false promises, and wire fraud. (Complaint ¶¶ 20 & 21).  It is not known how much money was defrauded from other investors that were lured into investing in Calloway and Bernard's scheme.

In or about April of 2008, Calloway conspired with Bernard, to coerce Boritzer, to provide Defendants with $300,000 by falsely representing to Plaintiff, both separately and together, that the money was necessary in order to invest in restaurants that defendants Calloway and Bernard were allegedly planning to open in New York City.   On or about May 22, 2008, relying on the misrepresentations made by Calloway in April of 2008, and by Calloway and Bernard at Tilman's later that month, Boritzer, via wire transfer, provided defendants with $300,000 to fund the restaurants Defendants had misrepresented they planned to open. (Complaint ¶¶ 22 & 23)

9

On or about September 16, 2008, at Calloway and Bernard's request and in reliance on their continued misrepresentations, Boritzer, wire transferred an additional $65,000 to defendants Calloway and Bernard to allegedly further invest in the aforementioned restaurants, which defendants promised and agreed to repay.  On or about October 1, 2008, at Calloway and Bernard's request, and in reliance on Defendant's continued misrepresentations, plaintiff Boritzer, wire transferred an additional $35,000 to defendants Calloway and Bernard to allegedly further invest in the aforementioned restaurants.  Calloway and Bernard, acting in their individual capacity and as principals of Bernard-Calloway 2008, coerced plaintiff Boritzer, to provide these funds with the use of deception, lies, and fraudulent statements about their intentions for the use of the funds in conversations between Plaintiff and defendants Calloway and Bernard individually, as well as conversations with both defendants Calloway and Bernard present. (Complaint ¶¶ 24 – 26)

In furtherance of their scheme, Calloway and Bernard, in their capacity as principals of Bernard-Calloway 2008, executed a promissory note in the amount of $600,000 payable to Boritzer.  Prior to Boritzer wire transferring of the aforementioned funds, Calloway and Bernard strongly discouraged Boritzer, from seeking legal advice from an independent attorney in regards to these transactions. (Complaint ¶¶ 27 & 28)

During relevant times, through discussions with Plaintiff in furtherance of and for the purpose of executing the scheme and artifice to defraud, defendants Calloway and Bernard, both separately, and together acting as partners in control of Bernard-Calloway 2008, on numerous occasions used and caused to be used interstate and foreign wire facilities as a means to obtain money from plaintiff Boritzer, by means of false and fraudulent pretenses and misrepresentations, constituting the offense of wire fraud, in violation of 18 U.S.C. § 1343.  In

carrying out the scheme to defraud plaintiff Boritzer, defendants Calloway and Bernard, acting in their individual capacity and as principals of Bernard-Calloway 2008, engaged in conduct in violation of 18 U.S.C. §1343, the criminal statute for wire fraud by compelling $400,000 to be transferred through COMMERCE BANK, CHASE BANK, and HSBC BANK, all international organizations engaged in transnational commerce on May 22, 2008; September 16, 2008; and October 1, 2008. (Complaint ¶¶ 29 & 30)

### EFFECT ON INTERSTATE COMMERCE

The activities of defendants Calloway and Bernard, in their individual capacity and as principals of Bernard-Calloway 2008, in the formation and execution of the illegal scheme and artifice to defraud caused and continues to cause pervasive and substantial harm to persons engaged in interstate and foreign commerce, including harm to persons and businesses engaged in the banking industry worldwide, by fraudulently causing customers of these banking organizations to reassign and transfer significant sums of money between multiple accounts. (Complaint ¶ 31)

## ARGUMENT

### STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), the court is required to accept as true the facts alleged and draw all reasonable inferences in plaintiff's favor.  See ATSI Comm'ns Inc. v. Shaar Fund, Ltd., 493 F. 3d 87, 98 (2nd Cir. 2007); Wynder v. McMahon, 360 F.3d 73, 78 (2d Cir. 2004).  After considering the allegations of the complaint, a motion to dismiss should only be granted where it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. Automated Salvage Transp. Inc. v.

11

Wheelabrator Envtl. Sys., Inc., 155 F. 3d 59, 67 (2d Cir. 1998).  However, "the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  Chance v. Armstrong, 143 F.3d 698, 701 (2nd Cir. 1998) (citations and quotations omitted).

Moreover, only plaintiff's fraud allegations are subject to Rule 9(b), the RICO claims and the other predicate acts on which they are based do not need to be set forth with particularity. See Hecht v. Commerce Clearing House, Inc., 897 F2d 21, 26 n. 4 (2d Cir. 1990); Liberty Mutual Ins. Co. v. Blessinger, 2007 WL 951905, at 10 (E.D.N.Y. Mar. 27, 2007)("In pleading the enterprise requirement the plaintiff need satisfy only the notice pleading requirements of Federal Rule of Civil Procedure 8(a)").

Rule 9(b) is not designed to shield defendants from liability for their fraudulent conduct. As the Court held in In Re Sumitomo Copper Litigation, 995 F.Supp. 452, 457 (S.D.N.Y. 1998):

> [W]hile Rule 9(b) may be construed strictly in the context of civil RICO actions, it should not be applied in a manner which would, in effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions.  RICO clearly provides for civil remedies to benefit victims of racketeering, and in the absence of congressional action, these provisions should not be ignored.

> Rather, Rule 9(b) is a procedural mechanism designed to ensure that defendants are

adequately apprised of their wrongdoing.  See Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990). The particularity requirement of Rule 9 is not intended to abrogate or mute Rule 8(a), which calls for a short and plain statement of claims for relief. DiVittorio v. Equidvne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) (citations omitted).  Indeed, the two rules must be read in harmony with one another.  Schaller Tel. Co. v. Golden Sky Systems, Inc., 298 F.3d 736, 745 (8th Cir. 2002).

**PLAINTIFFS HAVE PLEADED A VALID RICO CLAIM UNDER 1962(c)**

To properly plead a claim under 1962(c), a plaintiff must allege (1) a violation of the RICO statute, (2) an injury to business or property, and (3) that the injury was caused by the violation of 1962.  Defalco v. Bernas, 244 F3d 286, 305 (2d Cir. 2001).

Congress has stated that RICO "shall be liberally construed to effectuate its remedial purposes." Pub. L. 91-452, § 904(a), 84 Stat. 922, 947 (1970).  As the Honorable Judge Jed S. Rakoff, has admonished: "the lower federal courts…. have sometimes attempted to erect barriers to the private use of RICO, only to have these limitations removed by higher federal courts applying the plain and very broad language of the statute." Jed S. Rakoff, "The Fundamentals of RICO", in Jed S. Rakoff and Howard W. Goldstein, eds., *RICO: Civil and Criminal Law and Strategy* §1.01 at 1-1, 1-6 (Law Journal Seminars 2005).  "RICO is to be read broadly," and Congress intended that civil RICO have precisely such a broad application.  See also, Sedima v. Irmex Co., 473 U.S. 479, 497-500 (1985)(instructing the lower courts to heed the expansive language of the statute and construe if broadly when dealing with civil RICO claims)

Here, Plaintiffs have adequately pleaded a RICO claim.[2]

## I. Plaintiffs Have Pled Their RICO Claim With Sufficient Particularity

Contrary to Calloway's contentions, Plaintiffs have adequately pled at least two predicate acts for a RICO claim with the requisite particularity in accordance with FRCP 9(b).  Included in

---

[2] The Complaint adequately pleads that Bernard-Calloway 2008, LLC ("the LLC") is a separate legal entity existing as an enterprise under 1961(4). A plain reading of the Complaint shows that Plaintiffs do not in fact contend that the LLC is a RICO "person." Rather, Plaintiffs allege that Calloway and Bernard are the RICO "persons" (Complaint at 10),  while the LLC is a corporate entity constituting the RICO enterprise. (Complaint at 75).  See Cedric Kushner Promotions, Ltd. v. King. 533 U.S. 158, 163 (2001).

the list of predicate acts under RICO, is wire fraud. *See*, 18 U.S.C. 1343.  Plaintiffs have alleged

the details of at least three specific instances in which Defendants used, or caused to be used,

interstate wires in connection with their RICO racketeering scheme, specifically the causing of

Plaintiffs to make three separate wire transfers. (Complaint ¶ 30)  The first of these transfers, for

$300,000, was made on May 22, 2008 (Complaint ¶ 52), followed by the second transfer for

$65,000 on September 16, 2008 (Complaint ¶ 63), and the third transfer on October 1, 2008 for

$35,000 (Complaint ¶ 64).  These allegations plainly satisfy Rule 9(b).

While the Federal Rules of Civil Procedure may require a heightened pleading standard

for allegations of fraud under Rule 9(b), there is no bright line rule for deciding whether a

complaint has satisfied those requirements. Berk v. Tradewell, Inc., 2003 WL 21664679

(S.D.N.Y. July 16, 2003).  Courts have held that where a complaint sufficiently describes "the

nature and operation of the scheme in which defendants are alleged to have participated, the

heightened pleading standard may be relaxed." Zito v. Leasecomm Corp.,  2004 WL 2211650

(S.D.N.Y. Sept. 30, 2004).   "The complaint need not specify the time, place and content of each

communication where the nature and mechanics of the underlying scheme are sufficiently

detailed." Beth Israel Med. Ctr. v. Smith, 576 F. Supp 1061, 1070-71 (SDNY 1983).

 In order to allege a violation of the wire fraud statute, a plaintiff must allege (1) a

scheme to defraud, (2) to get money or property, (3) furthered by the use of interstate mail or

wires. United States v. Autuori, 212 F.3d 105, 115 (2d Cir 2000).  The Complaint repeatedly

alleges the existence of these facts.  For example, Plaintiff alleges that Defendants "operated as

part of a long term association for a criminal purpose with the practice of defrauding investors by

making false representations that Defendants would open certain restaurants that Defendants

never intended to open, or that Defendants intended only to open for a short period to obtain investors funds and then close down immediately, with the sole intent of defrauding the investors out of their invested monies" (Complaint ¶ 18, 41, 44).  That in furtherance of their scheme they caused Plaintiffs to wire transfer $300,000 on May 22, 2008 (Complaint ¶23); $65,000 on September 16, 2008 (Complaint ¶ 24), and $35,000 on October 1, 2008 (Complaint ¶ 25).  These funds were to be invested in the restaurants Defendants misrepresented their intention to open or purchase. (Complaint ¶ 22)  Further, Drexel Burnham Lambert, Inc. v. Saxony Heights Realty, 777 F.Supp 228 (1991), the case cited by Calloway, is distinguishable because unlike the plaintiffs in Drexel Burnham Lambert, the Plaintiffs here adequately allege that Defendants engaged in a scheme to defraud, as is required to sufficiently plead the predicate act of wire fraud (Complaint ¶ 21).  As such Plaintiffs do not fall short of the pleading requirements.

Furthermore, Defendants' contentions that Plaintiffs failed to adequately allege facts specific to each defendant are without basis.  Plaintiffs' complaint specifically details the role that each defendant played in furthering the scheme and causing Plaintiffs to transfer the $400,000 via interstate wire.  The Complaint describes how Calloway initially came to Plaintiffs with his business plan and introduced Plaintiffs to Bernard. (Complaint ¶ 32-34)  It sets forth the content of various meetings and conversations Plaintiffs had with Defendants leading up to the initial investment, and how each Defendant used their various past successes, including Calloway's celebrity status, and Bernard's success at Tilman's, to coerce Plaintiffs into believing this was a legitimate investment opportunity. (Complaint ¶ 36-40)  Specific representations made by each defendant are included in the Complaint, such as their claims that their plan was a "guaranteed success" (Complaint ¶ 37)  and "a great opportunity for Plaintiffs to get into the restaurant business" (Complaint ¶ 45).  The Complaint further discusses the undue pressure each

15

defendant placed on Boritzer to invest additional funds after the initial wire transfer was made,

(Complaint ¶ 55-59), as well as the meetings between Defendants, Plaintiff, and Jacob Goldsmith

that eventually led to the additional $65,000 and $35,000 transfers to Defendants. (Complaint ¶

60-64).

However, even if such details had been omitted, under 1962(c) to show a defendant

"conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs"

merely requires that the plaintiff allege that the defendant participated in the operation or

management of the enterprise." DeFalco at 451.  A failure to further describe a defendant's role

with additional specificity at the pleading stage does not render the Complaint inadequate. *See*,

Hottinger v. Amcoal Energy Corp., 1994 WL 652499 (S.D.N.Y. 1994).  "Where there are

multiple defendants, it is not necessary to allege that each defendant personally used the mails or

wires; it is sufficient that a defendant causes the mail or wire to be used."  In re Sumitomo

Copper Litigation, 995 F. Supp 451, 456 (S.D.N.Y. 1998).  In complex civil RICO actions

involving multiple defendants, Rule 9(b) does not require that the temporal or geographic

particulars of each mailing or wire transmission, made in furtherance of the fraudulent scheme,

be stated with particularity. Id.  Rather, Plaintiffs need only delineate the specific circumstances

constituting the overall fraudulent scheme.  Allstate Ins. Co. v. Etienne, 2010 WL 4338333

(E.D.N.Y. 2010)

Plaintiffs have substantially exceeded their burden in regards to the allegations directed at

each defendant. It is aptly pleaded that Calloway and Bernard were both controlling members of

the RICO enterprise, who separately and repeatedly misrepresented their intentions of opening

several restaurants to Plaintiffs in order to get possession of their funds. (Complaint ¶ 18, 22, 26,

39, 40, 46, 56, 75)  Moreover, as discussed above, Plaintiffs have fully outlined the details of each defendant's function in perpetrating their scheme.

When deciding whether Plaintiffs' allegations satisfy Rule 9(b), the Court should consider the three policy goals of the rule: (1) to provide a defendant fair notice of the plaintiff's claim to enable preparation of a defense ; (2) to protect the defendant from harm to its reputation or goodwill;  and (3) to reduce the number of strike suits.  <u>Reingold v. Deloitte Haskins & Sells,</u> 599 F.Supp. 1241, 1266 (S.D.N.Y.1984). When analyzing the sufficiency of Plaintiffs' pleadings under Rule 9(b), the Court must balance Rule 9(b) with both Federal Rule of Civil Procedure 8(a), which requires a short plain statement of claims, and 8(f), which requires that all pleadings should be construed to do substantial justice. <u>Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp</u>., 2003 WL 22218643 (S.D.N.Y. 2003). Thus, a plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to the defendants of the claims and grounds upon which they are based. <u>International Motor Sports Group, Inc. v. Gordon,</u> 1999 WL 619633 (S.D.N.Y. 1999).

The Complaint clearly sets forth the dates and amounts of each wire transfer that Defendants induced Plaintiffs to make in furtherance of their scheme, as well as which banks were used to make and receive the transfers. (Complaint ¶ 23-25, 30, 52, 63, 64, 76)  These facts are more than sufficient to provide notice of the grounds for the claims against Defendants.  It follows that Plaintiffs' pleadings are sufficient to withstand Defendants' motion to dismiss on such grounds.

As noted, many of the intricate details regarding the extent of Defendants' scheme and their actions towards additional investors, is in the sole possession of Defendants.  Plaintiffs

reasonably believe that other uses of interstate wire in furtherance of Defendants' fraud will emerge during discovery.  Should the court determine that Plaintiffs have not pleaded sufficiently the additional acts of fraud with the requisite particularity, Plaintiffs request that the Court grant leave to conduct discovery for this limited purpose and to thereafter amend the Complaint.  In the RICO context in cases where Plaintiffs specific allegations make it likely that a defendant has used interstate mails or wire, and where this information is in the exclusive control of the defendants Rule 9(b) has a differing applicability. Under such circumstances, case law has allowed for limited discovery prior to dismissal of the claims.  Before granting a motion to dismiss, the Court should make a determination as to whether further discovery is warranted, and if so, Plaintiffs should be provided with the opportunity to amend the Complaint after such discovery is complete.  *See,* Uviles v. RYS Int'l Corp., 443 F. Supp. 2d 233 (D.P.R. 2006); Ahmed v. Rosenblatt, 188 F.3d 886 (1ˢᵗ Cir. 1997).  There simply has been no discovery here.

## II. PLAINTIFFS SUFFICIENTLY PLED A CONTINUING RICO PATTERN

To assert a pattern of racketeering activity under 1962 a plaintiff needs to allege (1) at least two predicate acts of racketeering occurring within a 10 year period, (2) that the predicate acts are related to each other, and (3) that the predicate acts amount to or pose a threat of continued criminal activity. Cofacredit S.A. v. Windsor Plumbing Supply Co. Inc., 187 F. 3d 229, 242 (2d Cir. 1999).  Plaintiffs have met their pleading burden in the Complaint.

Continued criminal activity in this context can be established by alleging a series of related predicates extending over a period of time that were neither isolated or sporadic.  This is known as "closed-ended" continuity. Additionally, continuity can be established by what is known as "open ended" continuity by alleging facts from which it may be inferred that the

predicate acts were the regular way Defendants operated the enterprise, or that the nature of the predicate acts themselves implied a threat of continued criminal activity. DeFalco, at 320-323. At the pleading stage, if the threat of continuing racketeering activity can be inferred from the complaint, then whether the defendants' actions are continuing in nature as opposed to isolated or sporadic will be the subject of proof at trial. Dymm v. Cahill, 730 F. Supp 1245, 1261 (S.D.N.Y 1990).

## A . Closed-Ended Continuity

To satisfy closed-ended continuity, it is required that Plaintiffs allege "a series of related acts extending over a substantial period of time." H.J. Inc., v. Northwestern Bell Tel. Co., 492 U.S. 229, 242 (1989).  As a preliminary matter, while Defendants attempt to minimize the length and complexity of their scheme by characterizing this dispute as a "single transaction gone sour," and suggest that this mandates dismissal, a number of cases have held otherwise.

There is no requirement, under RICO, that plaintiff allege a pattern of more than one scheme.  In fact, the Second Circuit specifically rejected that contention.  It is well settled in this Circuit that multiple schemes are not essential for demonstrating continuity, particularly at the pleading stage.  Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 16 (2d Cir. 1989). See also, Hansel N Gretel Brand v. Savitsky, 1997 WL 543088 (S.D.N.Y. 1997) (quoting United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir. 1989); Jacobson  v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989) (single scheme to defraud a single victim of his real estate holdings found sufficiently continuous on a motion to dismiss); Polycast Technology Corp. v. Uniroyal, Inc., 728 F. Supp. 926, 948 (S.D.N.Y. 1989) (continuity found where complaint alleged a complex scheme consisting of numerous predicate acts to defraud a single

victim); <u>Greater Blouse, Skirt & Undergarment Ass'n v. Morris</u>, 1993 WL 410167 (S.D.N.Y. 1993) (Demanding a case-by-case contextual analysis, continuity does not require proof of multiple schemes, or numerous victims or perpetrators); <u>Dooner  v. NMI Ltd</u>., 725 F. Supp. 153 (S.D.N.Y. 1989) (numerous predicate acts by partner to divert partnership assets sufficient to state a pattern on a motion to dismiss); <u>Corn-Tech Assocs. v. Computer Assocs. Int'l</u>, 753 F. Supp. 1078, 1091 (E.D.N.Y. 1990) (single victim-single scheme found sufficiently continuous to establish pattern on motion to dismiss).

Nonetheless, Plaintiffs have alleged facts that indicate a far-reaching and multi-victim scheme lasting a number of years, which easily meets the necessary pleadings for closed-ended continuity.  Plaintiffs have set forth allegations that Defendants engaged in an analogous course of conduct with a number of investors for at least five years.  Defendants' argument "that Plaintiffs allege no facts showing Defendants committed anything other than a single fraudulent transaction" is simply ignoring Plaintiffs' allegations that similar actions were taken with other investors over the course of *at least 5 years*. (Complaint at 19).  The Complaint lists a number of other restaurants with which Defendants were involved with during this 5 year period that either failed to open, or opened for only an extremely brief period of time, where it is believed that a similar course of action was taken. (Complaint at 42).

Moreover, New York law recognizes that it is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge of the party against whom the fraud is being asserted<u>. Jered Contracting Corp.v. New York City Transit Auth.</u> 22 N.Y.2d 187, 194 (1968).  In these instances, heightened pleading is not required.   When the circumstances constituting a fraud are impossible to state in

detail, it is required only that the misconduct complained of be set forth in sufficient detail in the pleadings to clearly inform Defendants with respect to the incidents complained of.  Lanzi v. Brooks, 43 N.Y.2d 778, 780 (1977).  The Complaint clearly refers to Defendants' other projects by name, and as such is sufficient to notify Defendants of their related activity that Plaintiffs believe was fraudulent. (Complaint ¶ 42)

Calloway's contentions notwithstanding, through discovery Plaintiffs are likely to unveil a complex and far-reaching scheme involving multiple transactions and multiple victims over an extended period of time.  As such, Plaintiffs' Complaint should not be dismissed on account of Calloway's baseless arguments regarding a lack of closed-ended continuity.

**B. Open Ended Continuity**

The Complaint also meets the requirements for open-ended continuity. To satisfy open-ended continuity, Plaintiffs need not show that the predicates extended over a substantial period of time, but rather must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed.  H.J. Inc. at 242-243.

In assessing whether or not Plaintiffs have shown open-ended continuity, the nature of the enterprise and the predicate acts are relevant.  GICC Capital Corp. v. Technology Finance Group, 67 F.3d 463, 466 (2d Cir. 1995) Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity. "The threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long term association that exists for criminal purposes."  H.J. Inc. at 242-243.   On the other hand, where

the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.  Id. at 243.

Plaintiffs have met the pleading requirements for open-ended continuity. The facts alleged are sufficient to create a basis to infer similar acts have been committed by Defendants in the past, and would be in the future.  Azrielli v. Cohen Law Offices, 21 F.3d 512 (2d Cir. 1994). As alleged, both defendant Calloway and defendant Bernard repeatedly attempted to obtain additional funds from Plaintiffs for more than two and a half years after the time in which the aforementioned predicate acts were committed. (Complaint at 68-69).  Such attempts were nearly identical in nature to those leading up to the previous wire transfers, however, were unsuccessful in their attempts to coerce a further investment from Plaintiffs.

Furthermore, Plaintiffs have alleged that the predicate acts are Defendants regular course of conducting their business, and have identified a number of other restaurants where Plaintiffs reasonably believe a similar course of action was taken by Defendants.  (Complaint at 19 and 42).  As discussed above, the details of Defendants other acts are solely within their possession, and as such are to be unveiled during discovery.  However, taking the facts alleged as true, as they must be, establishes that Defendants have defrauded countless investors for a large sum of money through their regular course of conduct, and as such pose a threat of open-ended continuing criminal activity.

**C. The Cases Relied Upon by Calloway are Inapplicable**

Calloway cites a number of cases in an effort to distort Plaintiffs' allegations that Defendants' scheme extended far beyond their actions towards Plaintiffs.  An analysis of the cases cited makes clear that the deficiencies in the complaints in those actions are non-existent in the Complaint here.  As discussed above, Plaintiffs have alleged that Defendants' scheme involved a number of other restaurant locations, in addition to the project in which Plaintiffs invested, being utilized to defraud various investors over an extended period of time. (Complaint at 16, 18, 41-42)  Comparable allegations are absent from the cases Calloway cites, and as such they are not applicable.

 For example, Nundy v. Prudential-Bache Securities, Inc., 762 F.Supp. 40, 44 (W.D.N.Y. 1991) involved the fraudulent purchase and sales of securities on the plaintiff's behalf, without authorization. The RICO claims in Nundy were dismissed because the plaintiff failed to allege that the defendants had committed the same or similar fraudulent acts before those alleged in the complaint, or that such acts would occur in the future. Id. See also, Passini v. Falke-Gruppe 745 F. Supp 991, 993 (1990)  (dismissing complaint because the plaintiffs failed to allege any facts tending to show that the defendants made a practice of defrauding designers in order to gain control of their designs); Continental Realty Corp. v. J.C. Penney Co., Inc., 729 F.Supp 1452, 1455 (1990) (dismissing complaint because Continental did not allege that the defendants previously engaged in similar acts of fraud); Richter v. Sudman, 634 F.Supp 234, 239 (S.D.N.Y. 1986) (same).

In contrast, this case is far more in line with H.J. Inc. v. Northwestern Bell Telephone Co., 109 S.Ct. 2893 (1989).  In  H.J. Inc., the plaintiffs alleged that Northwestern Bell had

committed various acts of bribery over a period spanning 6 years.  Id. at 2906. Plaintiffs also

alleged that these acts of bribery were Northwestern Bell's regular way of conducting their

business. Id.  In reversing the lower court, the Supreme Court held that dismissal of the

complaint for failure to plead a pattern of racketeering activity was not warranted. Id. Similarly,

here, as it has been alleged that Defendants did not merely engage in a single scheme targeting

Plaintiffs, but rather that it was Defendants' normal course of operating their business, and that

such acts occurred over at least a 5 year period (Complaint at 19), the Complaint should not be

dismissed for failure to plead a pattern of racketeering activity.

## III. PLAINTIFFS HAVE STANDING TO BRING A CLAIM UNDER RICO

Defendants' perfunctory argument that Plaintiffs have failed to properly allege what is

required for RICO standing is without basis.  There are three elements that must be pled in order

to demonstrate standing: (1) the defendants' violation of 18 U.S.C 1962, (2) an injury to the

plaintiffs' business or property, and (3) causation of the injury by the defendants' violation of 18

U.S.C. 1962. Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d. Cir 2003).   To plead causation

under RICO, a plaintiff need only allege that Defendants' misrepresentations caused plaintiffs' to

suffer economic loss.  Moore v. Paine Webber., 189 F.3d 165, 170  (2d Cir. 1999).  If

Defendants engaged in a pattern of racketeering activity in a manner forbidden by the RICO

provisions, and the racketeering activities injured Plaintiffs in their business or property, then

Plaintiffs have standing to bring a claim under 1962(c).  Sedima, at 495.

As discussed above, Plaintiffs have sufficiently alleged that Defendants engaged in a

pattern of racketeering activity in violation of 18 U.S.C 1962(c).   Further, the Complaint alleges

that Plaintiffs suffered damages in the amount of $400,000 together with interest, plus lost

present and future income, lost business opportunities, and the loss of the time value of money, as well as other consequential damages and attorney's fees. (Complaint at 79).

Moreover, the cases relied upon by Calloway do not support his theory that Plaintiffs here cannot recover because the losses were too remote.  On the contrary, the cases support Plaintiffs' ability to seek damages based on the facts alleged.   For example, in Lerner v. Fleet Bank,  318 F.3d 113 (2d Cir. 2003), the court determined that Plaintiffs lacked standing because they were not the direct targets of the defendant's predicate acts of fraud.  Rather, the plaintiffs' cause of action was predicated on the fact that they were indirectly injured due to acts that were targeted at a 3rd party.  Id.  at 123.   *See also,* Holmes v. Secs. Investor Protection Corp., 503 U.S. 258 (1992) (holding that plaintiffs who were injured as a result of insolvency of 3rd party caused by defendants' predicate acts could not maintain standing as they were not the direct target of defendants' acts).   Such facts are different than those here, as Bortizer was the direct target of Defendants predicate acts.

In short, Plaintiffs' losses here were the direct result of Defendants violation of 1962(c). (Complaint at 79).  Plaintiffs specifically allege that Boritzer relied on Defendants misrepresentations of their intentions for his investment when making each of the three wire transfers to Defendants' account. (Complaint at 23-25).  Defendants' claims that their actions are not a substantial factor in the chain of causation that led to Plaintiffs' losses are baseless.  In fact, Defendants' actions were the *only* factor that led to Plaintiffs losses.  Plaintiffs have alleged that it was Defendants who directly solicited the $400,000 investment from Plaintiffs, and not the other way around. (Complaint at 34-36 and 45).   Had Defendants not targeted plaintiff Boritzer as part of their scheme, such losses would have never occurred.

Additionally, Plaintiffs have set forth sufficient facts to establish that their losses were proximately caused by Defendants' fraudulent conduct.  Plaintiffs have alleged that Defendants acted with the sole intent of defrauding Plaintiffs, that they never intended to open the restaurants that they misrepresented Plaintiffs' funds would be invested in, that Plaintiffs relied on those misrepresentations, and that Defendants never in fact purchased or opened the purported restaurants with those funds.  (Complaint at 18, 41, 65, and 82).  Defendants' acts are what caused Plaintiffs' losses. Not a single one of the alleged facts are in any way external economic factors that are an inherent risk in the restaurant industry. Rather, they are simply acts of fraud by Defendants.  The injuries to Plaintiffs resulting from Defendants' misrepresentations were not only foreseeable, but were an "inevitable consequence" of Defendants' actions.  *See*, First Nationwide Bank v. Gelt Funding, 820 F.Supp 89, 97 (S.D.N.Y. 1993).  Where the injury alleged is so integral an aspect of the enterprise there is "no question that the loss is precisely the type of loss that the claimed violations would be likely to cause."  Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 36 F.Supp.2d 560,  585 (E.D.N.Y. 1999).

## IV. PLAINTIFFS DO NOT ALLEGE A RICO CONSPIRACY

Calloway incorrectly argues that Plaintiffs RICO claim must be dismissed because Plaintiffs failed to allege facts implying that there was an "agreement between each of the defendants to commit at least two predicate acts."   This standard is simply inapplicable to this matter, and misstates the law. Rather, the standard cited by Calloway is that which is applicable to a RICO conspiracy claim under 1962(d). 18 U.S.C. 1962(d).  The cases cited by Calloway do not support that it is applicable to Plaintiffs' claim under 1962(c).  *See*, Hecht v. Commercial Clearing House,  897 F.2d 21, 25 (2d Cir. 1990); D'Orange v. Feely, 887 F. Supp. 152, 159

(S.D.N.Y. 1995).   Plaintiffs assert no such cause of action in their Complaint, as the only cause

of action brought under the RICO statute is that under 1962(c).   Since no 1962(d) claim has

been brought, dismissal of Plaintiffs' Complaint on such basis in not proper.

## V. PLAINTIFFS RICO CLAIM IS NOT PREDICATED ON A BREACH OF CONTRACT

Calloway's assertions that Plaintiffs' simply have a breach of contract claim are belied by

the facts.  Calloway and Bernard first approached Boritzer with their scheme in April 2008.   It

was at this meeting at Tilman's in April 2008, that Calloway and Bernard demanded Boritzer

invest $300,000, allegedly for Calloway and Bernard to open or purchase restaurants in New

York City.  (Complaint ¶¶ 35 – 40)

On May 22, 2008, Plaintiffs' wire-transferred the $300,000 to Defendants.  (Complaint ¶

52)

On June 3, 2008, <u>two weeks</u> after the wire transfer of the $300,000 investment, Calloway

and Bernard executed a Note for $600,000 in their capacity as principals of Bernard-Calloway,

2008.  (Complaint ¶ 53)

During the months of July and August 2008, Calloway and Bernard began demanding

that Boritzer invest more money with them allegedly for new opportunities.  (Complaint ¶¶ 567

& 58)   In September 2008, Calloway demanded that Boritzer bring Jacob Goldsmith to Tilman's

to meet with Bernard.  The purpose of the September 2008 meeting between Calloway, Bernard,

Boritzer and Goldsmith was for Calloway and Bernard to convince Goldsmith to lend monies to

Boritzer so Boritzer can invest them with Calloway and Bernard. (Complaint ¶¶ 59 – 61)

Goldsmith agreed to lend $100,000 to Boritzer so that Boritzer could invest those funds with Calloway and Bernard.  (Complaint ¶¶ 59 & 62)

On September 16, 2008, Boritzer wire transferred $65,000 to Calloway and Bernard at the account Calloway and Bernard had instructed to him to send the money.  (Complaint ¶ 63) On October 1, 2008, at Calloway and Bernard's insistence, Boritzer wire transferred another $35,000 to Calloway and Bernard at the account Calloway and Bernard had instructed him to send the funds.  (Complaint ¶ 64).

As set forth above and in the Complaint, the $600,000 Note executed by Calloway and Bernard had nothing to do with the funds they had demanded that Boritzer invest in their scheme.  If anything, the Note was simply another tool employed by Calloway and Bernard to defraud Plaintiffs.  (Complaint ¶ 27)  Indeed, the Note was not executed until two weeks after Boritzer had wire transferred the $300,000 to Calloway and Bernard, and three months before Boritzer wire transferee the additional $100,000 to Defendants.  (Complaint ¶¶ 52 – 64).)

Calloway's reliance on Passini v. Falke Gruppe, 745 F.Supp. 991, 993 (1990), is misplaced and to no avail.  The complaint in Passini was dismissed because the plaintiff alleged "no facts from which a pattern of racketeering activity could be inferred. " Id.  Such is not the case here, as aptly discussed above, Plaintiffs have sufficiently alleged facts that establish Defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

## VI. LEAVE TO AMEND IS LIBERALLY GRANTED AND SHOULD NOT BE DENIED

"Federal policy strongly favors determination of cases on their merits."  Rutter Group Practice Guide: Federal Civil Procedure Before Trial, Pleadings  ¶ 8:1461.   As such, the role of pleadings is limited, and "leave to amend the pleadings is freely given unless the opposing party

makes a showing of undue prejudice, or bad faith or dilatory motive on the part of the moving party," all which Defendants have failed to provide. <u>Foman v. Davis</u> 371 US 178, 182 (1962); <u>FilmTec Corp. v. Hydranautics</u> 67 F3d 931, 935–936 (Fed. Cir. 1995); <u>Martinez v. Newport Beach City</u> 125 F3d 777, 785 (9th Cir. 1997).

According to the Rutter Group Practice Guide: Federal Civil Procedure Before Trial, Pleadings ¶ 8:1376, under F.R.C.P 15(a), "a pleading may be 'amended' where the pleader desires to set forth allegations concerning events which took place before the original pleading was filed." The purpose of Rule 15 is to provide "the parties with flexibility in presenting their claims and defenses" and assuring "that cases will be heard on their merits and avoids injustices, which sometimes resulted from strict adherence to earlier technical pleading requirements." <u>Rutter Group Practice Guide: Federal Civil Procedure Before Trial</u>, Pleadings ¶ 8:1378; see also <u>Foman </u>at 182; <u>Slayton v. American Express Co.</u> 460 F3d 215, 228 (2nd Cir. 2006).

Additionally F.R.C.P. 15 "reflects the *limited role assigned to federal pleadings: i.e., their purpose is simply to provide the parties with fair notice of the general nature and type of the pleader's claim or defense*." <u>Rutter Group Practice Guide: Federal Civil Procedure Before Trial</u>, Pleadings ¶8:1378. As long as such notice has been provided, the pleadings should not limit the pleader's claims or defenses. <u>Foman</u> at 182; *See also,* <u>Grier v. Brown</u> 230 F.Supp.2d 1108, 1111 (ND CA 2002).

Therefore, Plaintiffs respectfully asks this court to recognize the liberality in granting leave to amend, especially in cases, as is the case here, where the pleadings have *more than adequately* put the Defendants on notice of the general nature of the Plaintiff's claims. (A copy of Plaintiffs' proposed Second Amended Complaint is attached hereto as Exhibit A)

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny defendant Albert L. Calloway's motion to dismiss Plaintiffs' (Corrected) First Amended Complaint in its entirety, or alternatively grant Plaintiffs leave to file a Second Amended Complaint.

Dated:      New York, New York
             September 7, 2012

THE BAEZ LAW FIRM PLLC.
ATTORNEYS FOR PLAINTIFF

_____
JOSE ANIBAL BAEZ
261 MADISON AVE – 26TH FLOOR
NEW YORK, NEW YORK 10016
212/213-9343

30

## CERTIFICATE OF SERVICE

I, DANNY EZRATY, hereby certify that on September 7, 2012, I caused a true and correct copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ALBERT L. CALLOWAY'S MOTION TO DISMISS PLAINTIFF'S (CORRECTED) FIRST AMENDED COMPLAINT, to be served by first class mail on:

Gerald Krovatin, Esq.
Krovatin & Associates
744 Broad Street – Suite 1903
Newark, NJ 07102
Attorneys for Defendant Albert L. Calloway

Lesly Bernard
165 West 26th Street
New York, NY 10001

Bernard-Calloway 2008, LLC
165 West 26th Street
New York, NY 10001

Dated: September 7, 2012

Danny Ezraty